With the Court's indulgence, I'd like to reserve two minutes for rebuttal, please. May it please the Court, I'd like to address three principal points this afternoon. First, is that every law controls and compels reversal of the order below. What the Court did below applies directly in the face of the every law case. Second, that the lower court's use of representational nexus tests, which was made up out of Nehru cloth, would mire the federal courts in making subjective value judgments as to the nature of representation, as to who is within representation, and that would be done under the guise of the Equal Protection Clause, and those values and judgments are best made by the legislative branches and the people. And the third and final point is that the lower court's order creates a perverse result, a result that is nonsensical and doesn't further any notion of representational equality. First, every law controls. Resident Court 8-0 held recently that it is, quote, plainly permissible for jurisdictions to apportion legislative representation by, quote, total population of state and local legislative districts. This is exactly what Cranston did in this case. It apportioned its laws in the city using total population. Note the word plainly. The thing was plain because it wasn't a closed case. It was 8-0. It wasn't closed case as to what they decided, but it was 8-0. And also total, the word total. There's no question that residents are included in the total population as calculated by the United States Senate. These word lines, do I correctly understand they are solely for purposes of municipal elections? I'm sorry. The word lines that we're talking about here. Yes, they're only for municipal in this particular case. It was plainly because, as the court said, history, precedent, and practice all pointed to this being constitutional and permissible. So to history, the United States Constitution apportions within states for United States representatives based on population. It would be a very odd interpretation of the Constitution that in the same document, the 14th Amendment would prohibit states and localities from using the very same principle that is mandated for apportioning United States representatives. Precedent and practice. As far as precedent, there's been five decades of litigation and reapportionment, the cases of leeching involving reapportionment litigation since Wells v. Sims. Virtually all political jurisdictions in the United States have, over those five decades, apportioned based on total population. There's only been, at the time Evanwell was decided, one case, a Florida Federal District Court case, that ever said that apportioning based on U.S. Census absent discrimination was unconstitutional. We now have two cases. That case, pre-Evanwell, and Judge Laguerre after Evanwell. And I understand that in this case there is no claim made of any discriminatory purpose. Absolutely not. There's nothing mentioned in their complaint line. No facts ever came up on that. And they actually, it's a penal numbers case. We say 6% maximum deviation. They say it's 28. You only get to the 28 if you buy their theory on a representational nexus. So here we have no discrimination. I might add that there's five, for Evanwell there were five, I'm sorry, three circuit court appeal cases. You had the 4th Circuit in Daly v. Hunt. You have the Chen case in the 5th Circuit in the Gaza case in the 9th Circuit. So even if we didn't have Evanwell, you had three circuits saying that absent discrimination, there's nothing wrong with apportioning based on total population. And the court also talked about the practice. The fact is census data is the best population data available. The best numbers. It is objective. It is counted the same way all across the country. It's not capable of numerical manipulation at the local level. The numbers are the numbers. Counsel, what do we do with the amicus brief from the Census Bureau former officials? Well, I don't disagree with them that necessarily the way the census counts has to dictate, and I don't think anyone knows that, but I've left that question open, has to dictate how legislative districts are apportioned. So I'd say we disagree with what they say. It's not 100 percent determined, but it is certainly one permissible way that a legislative body can redistrict. Okay. So your view of Evanwell is there are a number of permissible outcomes for the local officials to choose among. Correct. Evanwell specifically reserved only one question, and that was a question brought up by the United States government, which is whether electoral equality, whether you could count by votes or registered voters, was, I would say, illegal. They kept that question open. There's no question that they decided that total population was permitted. I might add, there's probably no question that they knew that prisoners were involved, because the same amicus that are filed in this case filed in the U.S. Supreme Court, and they said there, well, representational equality is fine, except when prisoners are involved. So they had those amicus briefs before then. Prisoners came up twice in moral argument before the U.S. Supreme Court, in an Evanwell, albeit in a tangential way, but they were mentioned. So there's no question, it seems to me, there's a footnote in the U.S. Supreme Court decision that refers to one state that actually includes excludes in the counts of people convicted of a crime. So there's no question the U.S. Supreme Court ruled that prisoners were involved in total population. So I wouldn't say total population, except for prisoners or anything like that. So, again, we believe that it is determined. Plaintiffs here say Evanwell has, quote, no direct bearing on the instant case. I find I have to believe that what Cranston did in this particular case is exactly what was blessed by the U.S. Supreme Court in Evanwell. Do you view Evanwell, I can see your argument that it was blessed by Evanwell, but in your view, does Evanwell preclude the use of a representational nexus test? I believe it does, because it's not consistent at all with the approach taken by the U.S. Supreme Court, which is to apply total population. That test is totally objective and doesn't, you know, make all kinds of judgments as to who is a true constituent and who is not a true constituent. And that is a very slippery slope, I would suggest, for the federal courts to follow in terms of trials. So are you asking us to specifically rule not only that the choice made by the city council and legislature here is constitutional, but that the representational nexus test may not be used? I think that would be the wise thing for this court to do, because I believe it is a very slippery slope for other courts to go down, and I think that guidance would be something that is fully consistent with Evanwell that says you're going through population. Okay, so it's an area of law by the district court to have used that test. They didn't apply Evanwell and apply the test that we believe was precluded by Evanwell, and certainly what Cranston did is permitted by Evanwell, so why do we have to get into some of the morass, which I'll mention, in terms of deciding who is really of representation or not. I mean, they presented it as if the prisons are on this isolated island with a bubble. The fact of the matter is they had a lot of commonality with the other folks in Ward 6. They breathe the same air, so they had air pollution problems that could affect both of them. Aren't you getting into the slippery slope you want us to stay at? I'm trying to illustrate why you don't want to go down that slope. Based on the limited record here, you know, you have, you know, they breathe the same air, they use the same wastewater, they have as clearly an interest in the fire protection and rescue services, where is the fire station located locally, what's the response time, are they properly staffed, all of these other things affect both prisoners and non-prisoners, as well as the visitors and families of the prisoners. So what I'm suggesting is you don't want to go down that path, and the court of those who have done it has forgotten. But you're not saying, are you, that a legislative body is precluded from considering representational nexus type questions? Not at all. In fact, they're the proper body to consider it, not the federal courts. And, again, from a public policy perspective, as opposed to what is constitutional or unconstitutional, sure, there are some arguments that can be made, and we can make some main arguments. We're not the state of New York. That's a totally different type of case as to whether, you know, the New York legislature is intentionally taking prisoners and moving them out to rural areas in order to dilute the votes of minorities in the more urban districts. That's not our case. That's not the case before you. Do we know whether the Supreme Court in Evanwell or otherwise has had presented to it the representational nexus? I'm not aware that anyone's used representational nexus other than the Flier case that I mentioned in Judge LeBure. The Flier case was put to Evanwell. Judge LeBure, who obviously at Evanwell rather than mine, came up with this test. I don't know how else he could have gotten around Evanwell, frankly. I'm a little confused here. If we find that the method actually used in Cranston was constitutional, we don't need to say anything at all about whether the representational nexus test is or is not constitutional if applied by a legislature. You do not have to decide this case. No, but for purposes of whether you've suggested that we should say we might be wise, I think, were your words to say that a court cannot do it. So I was simply asking whether the Supreme Court has actually said anything about that. Not to my knowledge. I think it would be wise for this court to provide that guidance to the lower court so they don't go down that path. Yes, but Judge Howard raised the question of suppose the legislature chooses to go down that path. Do you want to lay the basis for some claim that it's unconstitutional for them to do it? I'm not arguing that case. The Evanwell case left open the question of whether you could use some other basis under the total population, i.e. maybe registered voters or voters. That question was left open. You don't need to decide that in this case because Creason used what Evanwell said exactly could be used. Now, if you want to provide other guidance, and I do think a legislature could take all of these factors into consideration. Indeed, the state of New York or the state of Rhode Island could decide that the state, as a matter of policy, you have to change the constitution in our case, wants to apportion on something other than the census. That's perfectly permitted public policy for the state constitution in our case permitted it. The last thing I wanted to just point out is the perverse result of the judge's order. The result is the prisons are counted nowhere in the state. I don't know how that advances representation equality. Half these prisons are minorities. They have no local representation anywhere in the state because you can't order Creason to count them in Providence. So they have no one to defend them for either what they wish to accomplish. They have representation. They don't have local representation. They have no local elected official that would be directly responsible to them because they're not counted anywhere. What the court said is simply don't count them in Creason, but that doesn't mean they end up being counted somewhere else. Your Honors, may it please the Court, Adam Liaz for the plaintiffs. I'd like to start by briefly laying out plaintiffs' main arguments and then move quickly to addressing the points that opposing counsel have made. Your Honors, the courts have found two purposes of the one-person, one-vote principle, electoral equality and representational equality. And the district court has pointed out that counting the entire population of Rhode Island's only state-run correctional facility in a single city ward serves neither of those purposes. And Creason claims to be pursuing representational equality, but has failed to achieve this goal. And we know this because the Supreme Court has told us why representational equality is important. And this is where Evanwell does shed some light on the court's thinking. In Evanwell and Evans, the court has made clear that representational equality is about constituents having equal access to their representatives. And constituents are people who, regardless of whether they vote, have a real stake in local policy outcomes. And the point is here that the people who are incarcerated at the ACI do not function as constituents in the city of Cranston as opposed to in their home communities where they're actually from. Let me ask you a practical question. Who in Cranston is harmed by the way that Cranston decides to draw its ward lines? Your Honor, plaintiffs are harmed because they are currently experiencing, plaintiffs who live in wards one and four are experiencing three-quarters of the representation of their neighbors in ward six. What, six wards is it? Six wards, Your Honor. So I think what you're saying is that the people in five wards are harmed. Correct, Your Honor. Those are the overwhelming majority of the people in Cranston. Correct. They can dictate how to draw the lines. Well, Your Honor, in this case They're drawing the lines in a way that harm themselves and you're here to help them. Well, what we have here, Your Honor, is a diffuse harm and a concentrated benefit in ward six. And so that can often lead to inertia. We don't leave equal protection claims to the political process to solve itself because that's the nature of those claims. We wouldn't have much of the democratic process left in this country if we adopted that argument that we kind of step in and take care of those who aren't attentive enough to the diffuse harms they're subjecting themselves to. Well, I think, Your Honor, when we have an extreme violation, so we have right now a situation where we have a maximum deviation that's almost three times Brown v. Thompson's standard of what's acceptable. So we have a pretty extreme violation here. And so this is a classic one-person, one-vote case in the sense that we're experiencing, our clients' plaintiffs are experiencing dilution of their ability to access their representatives. I don't understand your argument. And I don't think it's an accurate or fair direct response to Judge Keada. One prevents the other five districts from getting together and voting for a change in the method of districting. Aren't there enough people in that to overwhelm the people in District 6? Your Honor, there could be, but inertia and the unfairness of the status quo, inertia is not an answer to an equal protection claim, Your Honor. So it's possible in theory that the five worlds could overwhelm the six worlds, but that hasn't happened. The Supreme Court has repeatedly, for almost forever, cautioned courts about intervening in this process and seems to have a pretty strong presumption that we save our ammo before we do this. And when you come in here with a case where there's no sense of any invidious discrimination going on in Cranston, this isn't some way of harming a minority. And what you say is the majority is subjecting itself to this very abstract, diffuse, municipal. I think that suggests to me that this is not the type of situation that the Supreme Court envisions us really getting all fired up about and coming in and telling them they need to protect themselves better, and since they're not going to do it, we're going to do it for them. Well, Your Honor, it is true that there is language in the case law about deference to local jurisdictions. But that language, specifically, for example, in Burns v. Richardson, contains a very important qualification, which is unless those jurisdictions are making a choice the Constitution forbids. And I think the Calvin Court had the best and most reasonable read on what the Court meant by that, which is that when you are pursuing a plan that serves neither of the acceptable objectives of the one-person, one-vote principle, you are, in fact, making a choice the Constitution forbids. And I would point out that the city's position that they have unlimited discretion to use whatever population base it chooses in the absence of invidious discrimination, as you point out, that position leads to absurd results. According to the city, they could double the number of wards in Cranston. So now we have 12 wards in Cranston. The prison population at the ACI takes up a full half of one of the wards, and that's no problem or violation. But then the city could double again, create 24 wards in Cranston, where the prison takes up virtually the entire ward. You throw in a few registered voters and actual constituents, and you have no legal protection violation. And that's not fanciful. That's actually something very close to what happened in Anamosa, Iowa, which you have in the briefings. So the point is that the idea that absent invidious discrimination, there's no point at which the Court should get engaged in this particular scenario, it leads to absurd results. It has no end points. Well, in the over two centuries of our political experience in this country, can you ever think of something that remotely comes close to the majority doing what you just described as a hypothetical could happen in Cranston if we don't step in now? I can't. Well, what we have here is somewhat of an outlier, and I think this issue has come to the fore, in part because incarceration in this country has risen substantially in the last several decades, and now we have more than 2 million people in prisons, and that's starting to affect local jurisdictions in a significant way. And they can't protect themselves in two seconds. If the political will amongst the incumbents exists to do that, that's possible. I think the other thing that we're not discussing here is that the interest of the incumbents is not necessarily the same of the voters in their districts, and they have a very strong status quo bias, Your Honors. So I would say that we can't leave this to them. Now, I think the other point I would like to address directly is Evan Wells, since opposing counsel made such a point of it, and so I think the key point here is that Evan Wells does help to clarify what the Supreme Court meant by representational equality and why it's important, but it doesn't decide this case directly as the district court understood, and that's because jurisdictions are, per Evan Wells, permitted to pursue electoral equality. We have never challenged that position. The plaintiffs have never challenged that. In fact, the plaintiffs agreed with that position. So Evan Wells resolves the line of cases Garza and Shannon did at my opposing counsel reference, but Evan Wells simply is not about the precise population that jurisdictions must or may use to achieve the goal of representational equality. So when the court uses the term total population, in that context, the court is contrasting that with voter population, which is the metric that's impressed upon the court by the Evan Wells plaintiffs. Your brother said the arguments made to us in the amicus briefs were also made to the Supreme Court, so the question of prisoners as a particular constituent of the population was before the court, and it nonetheless chose to use the broad language that it did. What's your response? Actually, I think the court's notation in a footnote about the fact that some jurisdictions do adjust for prison populations proves my point, Your Honor, because it shows that the court said that all 50 states use total population as a base, and then it noted that seven of those states adjust the raw census numbers in some way to arrive at their metric. It did not say 43 states use total population and seven states use a different metric,  is that there's no contradiction between the court's use of the term total population and the idea that in special circumstances, the raw census numbers must be adjusted to achieve that metric. So we shouldn't answer the question of what would be done if the legislature were to adopt the policy positions of the two amicus. I mean, the Supreme Court may simply be saying that question remains open. All we're doing here is approving what the majority of the states have chosen to do, and partly out of deference to the fact that it's a local choice and not a choice for the federal court system. Well, Your Honor, as states and local jurisdictions have started to face this issue of distortion via prison populations in earnest, they have started to solve the problem themselves, presumably because of their own views of their own constitutional obligations. So we haven't really turned our attention to that. There are vastly different numbers than what we're talking about in Rhode Island. What would you—a very small number of sets. Actually, Your Honor, so there's about 9,000 jurisdictions in which the Census Bureau has identified at least one incarcerated person, and only about 100 of them could be as distorted or more distorted than what we have here in Cranston. So Cranston actually is a significant outlier. The other thing that makes Cranston unique, Your Honors, is that it's the entire incarcerated state or incarcerated population of an entire state is concentrated in a single city ward. So there are a number of circumstances, and the ACLU, my client, brought this to the attention of the Cranston local officials, urged them not to create a map that would include such distortions, and they made the choice anyway to do so. So there are local— Doesn't your representational nexus argument, it seems to run a risk—maybe it doesn't, but it seems to run a risk of giving too little weight to the actual presence of a human being in a physical location. Because I think of big municipal decisions like where to put cell towers, where to zone so a polluting factory can go in town and stuff. And it seems to me that under your approach, these thousands of prisoners who would be affected by where the polluting factory is put in a town would have no political power whatsoever to affect that decision. They'd be treated as if they're not human beings. Well, let me be clear, Your Honor. The folks who are incarcerated at the ACI have no political power to affect that decision right now. But even the people—at least they do indirectly, because they're neighbors who are similarly affected by changes in the physical space that they occupy, their adjoining spaces. Those neighbors, in effect, have enhanced political power, as you'll complain, because of the presence of the prisoners. Well, but, Your Honor, normally when you think about having political power in association with your neighbors, it's because you can actually communicate with them. These folks are isolated by force of law behind barbed wire, have no ability to interact with their neighbors, and part of the— Of course they can. They can write letters to the editor of the local newspaper. People visit— There are aid agencies that go and deal with prisoners. Well, Your Honor, in this case, there's been— We're not talking about solitary confinement. Well, what we are talking about is wholesale physical and political isolation from the surrounding communities, such that— Do you know that Massachusetts changed its constitution to prohibit felons from voting while in prison? Because before that, they had been quite successful in leading political campaigns against sheriffs, local sheriffs that they didn't like. It was precisely because they did have political power that Massachusetts made this change. Well, actually, I'm really glad that you raised voting, Your Honor, because I think that's the single best example of the absurdity of the situation. The undisputed facts in this case show that nearly two-thirds of the population of the ACI retains his or her right to vote because not convicted of a felony, but those folks have to vote not in Cranston, not based in the ACI location, but in their home communities. But to voters, they are given the option of voting. This is not a case of them being denied the right to vote? Correct, Your Honor. The point is that they are required to vote in their home communities where they actually function as constituents, and they are not actually permitted to vote in Cranston. So the exact concern that the Massachusetts government had that you referenced would not apply in Cranston to the prison population. They are not allowed to vote in Cranston. They are not allowed to send their children to public schools in Cranston. If you look at the factors that the court has told us about what it means to be a constituent, so, Your Honor, you mentioned presence. Sure, presence is one piece, but it goes beyond that. You have to have a meaningful stake in local policy outcomes, and, as the Evans court said, be connected with electoral decisions. But you're not challenging that. Well, Your Honor, what we're saying is that... You've described a law that you say has some bad effect on prisoners. No, Your Honor. What I'm saying is that the law is more evidence of the fact that the prison population... We believe, to be clear, the prison population, our constituents, are people who deserve representation in their home communities where they actually live and have a stake in the policy outcomes. What we are saying is that they are not functioning as constituents in this place, and that putting county law... So you don't think they should be allowed to register in Cranston? Excuse me? You don't think they should be allowed to register in Cranston? The legal presumption is that they are not domiciled in Cranston. But, Michael, is it the position of your clients that they should not be allowed... it would be bad policy to allow them to register in Cranston? There may be some cases in which a person could rebut the presumption of domiciliary because they intend to remain in Cranston beyond their incarceration. You're not answering the question. So, in some limited cases, it would be okay. In the vast majority of cases, no, Your Honor, it makes no sense for those folks to register to vote in Cranston. We're talking about a population that's there, on average, for 99 days. A third of the population who are awaiting trial are there for an average of only three days. These are folks who don't have a meaningful stake in local policy, and importantly for domicile concerns, don't intend to remain at the ACI or Cranston indefinitely. So the law in Rhode Island that presumes their residency in their home communities makes perfect sense. You have to have volition, presence, and intent to remain. It makes perfect sense. And let's contrast that, for example, with college students because the prison council raised that in their briefs, and there's actually a student housing facility on campus. And in any single way, college students and all the other types of populations you can imagine are on one side of a clear line, and the prison population is on the other side of a clear line, Your Honors. Thank you. I'm done. I think Judge Fiala hit the nail on the head. The presence of human beings within the ward affects the policies and practices of that ward. If we were to take the prison and move it from Ward 6 to Ward 1, there would be a whole different set of issues to be considered by the Ward 1 council person as opposed to the Ward 6 council person. So it balances out. It gives representational equality. Again, the result that the court did here cannot advance representational equality in our view in any way. It simply subtracts people. It's not inclusive. It's exclusive. We're going to exclude these people under the guise of representational equality, or they're going to have no representation anywhere else. So it doesn't make any sense at all. And the arbitrariness is in the slippery slope. For example, the inmate spirit witness didn't use exactly the population. He backed out all the people in Cranston who happened to be in the prison on the date of the census or had to go to a different database to get that, which how accurate that was we don't know. But he backs out maybe a couple hundred people. Right next door in the same census block is a juvenile correctional facility. Now, under their theory, the juveniles have a sufficient nexus with the city of Cranston because they didn't consider them at all. It doesn't make any sense. I'd argue the juvenile correctional facility probably has less connection, less willingness as a true constituent than the adult correctional folks. They say they have no choice to live there. They go, children don't vote. There's a lot of other examples. It really gets the federal courts mired in making the type of value judgments which are different in different places on the ground. There's different types of prisons. There's different types of prisons from, you know, short-term stay to life in prison or out parole. Thank you.